EUGENE JOSEPH TIMMERMAN, Respondent, v. TERMINAL RAILROAD ASSOCIATION of ST. LOUIS, a Corporation, Appellant, No. 41944—241 S. W. (2d) 477.

Division Two, July 9, 1951.

*Warner Fuller* and *Arnot L. Sheppard* for appellant.

*Mark D. Eagleton* and *Wm. H. Allen* for respondent.

288

ELLISON, J.—The defendant-appellant Terminal Railroad Association appeals from a judgment for $35,000 recovered against it by the plaintiff-respondent Timmerman under the Federal Employers' Liability Act in the circuit court of the city of St. Louis, for personal injuries sustained by him while in the service of that railroad as a switchman. For the purpose of throwing a switch he had just alighted from the front footboard of a Terminal switch engine into the eight foot space between the track on which it was moving and a parallel track, when a rapidly moving Wabash diesel locomotive on the latter track struck him and caused the injuries for which he sued. The grounds of negligence assigned were that: (1) the space between the two tracks was insufficient to afford a reasonably safe place to work; (2) the appellant negligently failed to warn respondent of the approach, proximity and movement of the Wabash locomotive; (3) and negligently failed to stop its own locomotive before appellant was injured.

Appellant makes seven assignments of error here: (1) that respondent failed to make a submissible case for the jury; (2) that respondent's charge of appellant's failure to furnish him a safe place to work, based on the close proximity of the two railroad tracks, is unfounded in law and fact; (3) that the trial court erred in overruling appellant's challenges to the competency of two veniremen; (4) respondent's instruction No. 1 was erroneous in three respects; (5) the trial court erred in refusing to give appellant's instructions

F *or* G, or H *or* I; (6) the argument of respondent's counsel, duly objected to, was prejudicially erroneous; (7) the verdict was excessive.

Subjoined is a photograph of the scene of the casualty, appellant's Exhibit A, the camera facing south and the picture looking north with two parallel railroad tracks extending in that direction toward the viewer. The left track is called the Wabash track, and the next track to the right the Terminal track. The strip of land they occupy is Second Street in St. Louis and the tracks were placed there by sanction of a city ordinance. About midway in the space between them will be seen the railroad switch stand which figured in respondent's injury. It is practically flush with the ground and connected with the Terminal track. It was manually operated and served to pass cars between the Terminal track and the S curve track coming in from the southwest.

On the morning of the casualty about 7 a. m. appellant's switch engine was pulling twelve freight cars northerly over the S curve switch track intending to place them on the Terminal track. Respondent and the switch foreman and another switchman all were on the front footboard of the engine, respondent being on the east side nearest the switch that had to be thrown. The engineer and fireman were at their positions in the engine cab. Respondent, who said he had had 15 years experience as a switchman, testified he stepped off the footboard in the usual way to throw the switch, after the front of the engine had passed it about 5 feet and was moving about 3 miles per hour. The rear end of the engine was still on the curved track swung some to its left, thereby causing the front end to pivot 6 to 10 inches in the other direction toward the switch stand as respondent was alighting. Without any warning as his right foot reached the ground he was suddenly struck by a Wabash engine, which had come up unnoticed at rapid speed from the south on the parallel track.

On the point that the 8 foot space between the two parallel tracks was insufficient to make the switch stand a safe place to work, the following evidentiary showing was made by respondent. Both the tracks were standard gauge. That is, each was 4 feet 8-½ inches wide between the rails. Sixty years earlier when the switch tracks were laid engines and cars were much narrower than now. Some box cars now in use are 11 feet 6 inches wide. The over-all outside width of the switch engine was 10 feet 7 inches. Deducting from this the width of the track, made the overhang of the engine outside the rails 32 inches on each side. The overhang of the Wabash diesel locomotive was the same. When the two engines passed, a 32 inch overhang space was cut off on each side of the 8 foot space between the tracks, reducing the open space by about 64 inches to 2 feet 8 inches. Respondent contends that was wholly inadequate, and that a working space of about four feet was required in alighting from the moving engine for switching operations. This consisted of about 18 inches

representing the length of the partially extended arms in alighting, and 28 inches for the width of the body in swinging around.

On the other hand the appellant Terminal developed the fact that its switch track was constructed in 1890 before the Wabash track was built; and that both tracks were installed on Second Street under sanction of a city ordinance. The Terminal asserts these facts exempted it from responsibility for the dangerous proximity of the two switch tracks. And it further maintains the respondent's own gross negligence was the sole cause of his injury, in that he stepped from the footboard of the Terminal's switch engine into the path of the oncoming Wabash locomotive without looking back to see whether traffic was approaching on that track. Thus appellant acquits both itself and the Wabash of negligence.

And the appellant Terminal further points out that respondent on the witness stand conceded he was familiar with the switching terrain at the locus in quo, and knew trains ran rapidly over the Wabash track, usually sounding a warning signal for a Mound Street crossing only 160 to 200 feet south of the switch stand, though no such warning was given on this occasion. And respondent further admitted he had made the same switching movement many times before and had followed a practice of looking back south before getting off the switch engine's footboard. But on this occasion he did not look back as or immediately before he alighted, because he was then getting information on the next switching movement from the switch foreman, Baker. However, he said he had looked when the switch engine was 20 or 25 feet further south and at that time saw no train on the Wabash track within the 75 foot range of his vision.

Appellant's first point is, as stated above, that the two railroad tracks here involved were installed on Second Street in St. Louis 60 years ago under sanction of a city ordinance. It contends those facts relieved it of responsibility for the dangerous proximity of the two switch tracks, notwithstanding such proximity made the switch stand between them unsafe as a place of work. On that point it cites Atl. C. L. Rd. Co. v. Driggers, 279 U. S. 787, 73 L. Ed. 956, 49 S. Ct. 490. We think the case is not in point. Briefly the facts there were that the plaintiff Driggers, a switchman, stepped from the footboard of a switch engine in motion, and was struck by the engine of a passenger train passing on a parallel track. The clearance between the two tracks was less than eight feet. The conductor of the switch crew attempted by signal to warn Driggers that the passenger train was approaching, but the signal was the same as one used for backing up. Driggers misunderstood it and stepped off the train he was on to throw the switch when he was struck by the passenger train.

The U. S. Supreme Court held his death was attributable solely to his own negligence and not to any negligence of the railroad company. We think the case is not controlling here. Granting the two switch

tracks on Second Street in this case were placed there under sanction of a city ordinance, that fact did not relieve the railroads using the tracks from exercising due care in operating over them. In the Driggers case the conductor did all he could to warn Driggers of the approach of the passenger train and Driggers misunderstood the warning and got down between the tracks without looking for the approach of the other train. In this case the Wabash engine appeared suddenly without warning and traveling at rapid speed. None of the crew attempted to protect Timmerman when he alighted to throw the switch. It is obvious that the Wabash engine then was close upon him. If the engineer or fireman of the switch engine had timely warned him of the approach of the Wabash engine he could have avoided the danger. And conceding he was guilty of contributory negligence, we cannot say as a matter of law that his negligence was so gross as to make his own conduct the sole cause of his injury.

Appellant asserts the facts in this case do not bring it within the operation of the safe place rule. It contends that since the two switch tracks were built in Second Street in St. Louis under sanction of a city ordinance, therefore it (the Terminal) cannot be convicted from the mere use of its track, even though that track was too close to the Wabash track, citing Booth v. St. L., I. M. & S. Ry. Co., 217 Mo. 710, 725-6(6), 117 SW. 1094, 1099; So. Pac. Co. v. Berkshire, 254 U. S. 415, 418(3), 65 L. Ed. 335, 41 S. Ct. 162; C. & O. Ry. Co. v. Leitch, 276 U. S. 429, 72 L. Ed. 639, 48 S. Ct. 336, and other cases.

In the Booth case, first cited, a switchman of the defendant railroad was standing on top of an unusually tall box car while it was being switched on a track in St. Louis which was crossed by the track of a street railroad company under a city franchise. The streetcar track had suspended thereabove a trolley wire charged with electricity. The trolley wires came in contact with the switchman, causing the injuries for which he sued. Held: the railroad was not responsible to the switchman for his injuries since it had no control over the trolley wire. In fact the opinion in that case held it "was not on the premises that the railroad company controlled." And the evidence further showed the trolley wire was 19 feet 5 inches above the railroad rails; the freight car was 2-½ feet taller than the ordinary car; the plaintiff switchman was an unusually tall man; and he had been passing under the wire almost daily in switching operations.

The other two cases cited by appellant, that is, the Berkshire and Leitch cases, both involved injuries received by trainmen who were struck by mail cranes suspending mail sacks close to a railroad track. The Berkshire case held the installation of mail cranes close to the track is not negligence on the part of the railroad company as respecting its employees, when they are placed uniformly and by direction of the Post Office department pursuant to a systematic plan. The decision declared a projecting mail crane arm is such a permanent

and conspicuous source of danger that it must be legally assumed an experienced locomotive engineer who leaned out of his cab window and was struck by a mail crane knew of the danger and assumed the risk. Three of the justices dissented in that case. The Leitch case followed the Berkshire case in a short opinion holding as to mail cranes that it would be impracticable to require a railroad to have no structures so near the track as to endanger persons leaning from the windows of the cars.

Both of these decisions, the Berkshire and Leitch cases, were considered by this court in Owen v. Kurn, 347 Mo. 516, 521-2(2), 148 SW. (2d) 519, 522(2) and it was there held the risks dealt with in those cases were regarded as ordinary risks of employment such as the employee assumes under the Federal Employers' Liability Act. On the other hand, as pointed out in the Owen case the employee does not assume extraordinary risks of the employment unless they are fully known and appreciated by him. And that certainly cannot be affirmed as a matter of law of the situation in this case.

 There was ample evidence to prove a custom for members of the Terminal switching crews to warn brakemen at the switch here involved of the approach of Wabash trains on the other track, if the Wabash engine crew failed to give such warning. Engineer Georgen on the Terminal switch engine with which the respondent was working, testified it was not a duty imposed by rule for him to keep a lookout for Wabash trains running north on the parallel track, and to warn his switch crew, but that he did do that by custom or routine as a humanitarian duty. And foreman Baker and brakeman Hass further of the switch crew likewise testified the engineer on the switch engine did give such warnings as a matter of custom every time he saw a switch engine approaching from behind them toward the switch stand. And Baker said the switchman relied on those warnings. Two other Terminal engineers testified that while it was not a set rule, nevertheless the engineers tried to protect the switch crew by whistle or other means if they saw a Wabash train coming and threatening danger to a switchman.

Appellant asserts the law does not permit employees thus to create a duty on each other without the knowledge and approval of the employer; that the custom in this case was not shown to be uniform and universal, or more than a variable practice depending on particular circumstances and the whim of the individual actor; and that reliance thereon was not proven. The foregoing testimony all came from Terminal employees who were called by it as witnesses, and we think it made a case for the jury on the issue of custom. That such a custom is sufficient to create the duty is held in Young v. Terminal R. R. Ass'n, 192 SW. (2d) 402, 404 (1-3); Evans v. A. T. & S. F. Ry. Co., 345 Mo. 147, 152-3(1), 131 SW. (2d) 604, 606(1);

O'Donnell v. B. & O. Rd. Co., 324 Mo. 1097, 1107(2, 3), 26 SW. (2d) 929.

Appellant next assigns error in the trial court's action in overruling its challenges to the competency of two veniremen, Mr. Steger and Miss Ogle. When the panel was being examined on voir dire, reference was made by counsel for appellant to the State Compensation Act, whereunder an employee could recover compensation from his employer although the latter was not at fault. And counsel cautioned the veniremen that such was not the fact in the case at bar. Then he proceeded to ask the venire whether they felt anyone injured should have compensation, and the following occurred.

"Mr. Sheppard: How about you, Miss Ogle? A. I feel any one injured should have compensation but I could abide by the Court. Q. You feel regardless of blame that there should be compensation do you? A. Yes, sir. Q. And it would take an effort on your part to lay aside that belief and listen to the evidence, is that right? Miss Ogle: I don't think it would be such an effort to abide by the court. Mr. Sheppard: You would have no trouble doing that? A. No."

As to another member of the venire, the following occurred: "Mr. Sheppard (counsel for appellant): And how about you, Mr. Steger? A. I think any one injured should get some compensation. Q. Regardless of the circumstances—regardless of blame? A. Blame should be it. Q. Even if the employer is not to blame you feel he (the employee) should be compensated? A. In a way, yes. Q. And would you have trouble getting away from that belief? A. No. Q. But you would start in believing and feeling that way? A. I believe I would."

The Court examined the venireman Steger as follows: "Mr. Steger, I followed your answers to the questions propounded to you with reference to your opinion about the right of recovery, whether or not the defendant is to blame and you said you thought the law should provide, as I recall it, that the injured employee should be compensated without regard to blame? A. No, sir, I said if he was to blame. The Court: 'If he was to blame'? A. Yes. The Court: You mean the plaintiff in the case? A. No, the full blame is on the company, I meant. The Court: Then, it is your opinion that the company should pay, is that correct? A. Yes."

Continuing the Court inquired: "What if the company is not to blame and the employee is injured, have you an opinion about such a situation? A. Well, I did feel he should get something for his injury." The Court then asked Mr. Steger if he thought he could set aside such a feeling or opinion as he might have in this case and try it solely on the evidence and instructions of the court. Steger answered that he could and would do so, excluding from his deliberations his own opinion as to what the rule should be when the company is not to blame.

We find no error in the court's ruling on these veniremen. McCarthy v. The Cass Ave. & F. G. Ry. Co., 92 Mo. 536, 539-40, 4 SW. 516, 517; State v. Burns, 351 Mo. 163, 177(8), 172 SW.(2d) 259, 267 (20, 21); State v. Londe, 345 Mo. 185, 189(2), 132 SW.(2d) 501, 503(4).

■ Appellant's next assignment is that respondent's Instruction No. 1 was erroneous in assuming, without requiring the jury to find, that it was the duty of the Terminal engineer to look out for and warn respondent of the approach of the Wabash locomotive; and in failing to require the jury "to find any facts showing the creation of such a duty by custom, rule or otherwise." The instruction covers more than 1-½ pages of the printed abstract and is repetitious. We shall not set it out at length.

We cannot uphold appellant's contention. The instruction did not assume the Terminal engineer was duty bound to look out for and warn the respondent switchman of the approach of the Wabash locomotive without requiring factual findings thereon. On the contrary it required the jury to find: that the Wabash locomotive was approaching on a parallel track; that the space between the two tracks, with the two engines passing thereon, was insufficient to afford the respondent switchman a reasonably safe place to work; that his duties required him to look forward (north) and not back, and he was unaware of the approach of the Wabash locomotive; that the Terminal engineer knew, or in the exercise of ordinary care should have known, the Wabash engine was approaching and imperiling respondent's safety; and still had time in the exercise of due care to have given respondent a warning, and thereby avert the casualty. Then the instruction concluded that if the jury found the Terminal engineer failed to exercise ordinary care to give such warning and was guilty of negligence in whole or in part directly causing respondent's injuries by failing to furnish him a safe place to work, the verdict should be for respondent.

The real gist of appellant's complaint appears to be that this instruction No. 1 did not require the jury to find any facts showing the creation of the Terminal engineer's duty to warn the respondent *arose* out of a "custom, rule or otherwise." On this point five Missouri cases are cited.[1] We cannot ■ see that they involve any point of concern here about a custom or rule. The first three are based on particular facts. The fourth and fifth merely hold that where an instruction covers the entire case and directs a verdict, the assumption therein of the truth of a controverted issue of material fact is erro-

---

[1] Weishaar v. K. C. Pub. Serv. Co. (Mo. App.) 128 SW. (2d) 332, 339(8); McCurry v. Thompson, 352 Mo. 1199, 1206(2), 181 SW. (2d) 529, 532(3); Weinel v. Hesse (Mo. App.) 174 SW. (2d) 903, 907; McCombs v. Ellsberry, 337 Mo. 491, 499(4), 85 SW. (2d) 135, 139(9); Ganey v. Kansas City, 259 Mo. 654, 663, 168 SW. 619, 621.

neous and not cured by other instructions properly submitting the issue.

It was unnecessary for instruction No. 1 here to submit to the jury the question of the existence of a *custom* for the engineer to warn switchmen of the approach of a Wabash locomotive when it was not sounding a warning. The existence of the custom as such was not a substantive part of respondent's cause of action but merely evidence of the prevailing practice, which had probative value. Term. R. Assn. of St. Louis v. Schorb, 151 Fed. (2d) 361, 364 (6); Hogan v. Fleming, 317 Mo. 524, 535(2), 297 SW. 404, 408(2), and cases cited therein; Timmermann v. St. Louis Architectural Iron Co., 318 Mo. 421, 436(7), 1 SW. (2d) 791, 797(7); Vogel v. St. L. Merchant's Bridge Term. Ry. Co. (Mo. App.) 16 SW.(2d) 624, 625(1); Hilton v. Thompson, 360 Mo. 177, 188(1), 227 SW.(2d) 675, 679(2).

Appellant's next point is that respondent's given instruction No. 1 was erroneous because it was in direct conflict with instruction No. 2 given at appellant's request. The complaint made is that instruction No. 1 authorized a verdict for respondent *without* a finding that appellant's engineer Georgen owed respondent the duty of watching for and warning against the approach of the Wabash locomotive, whereas instruction No. 2 *required* that finding.

We do not agree. It is true instruction No. 1 did not make the explicit finding appearing in instruction No. 2. But we think it substantially made the same requirement. It required the jury to find that respondent was engaged in his switching duties in an unsafe working place, and ignorant of the silent approach of the Wabash locomotive. And it further required a finding that appellant's engineer knew, or by the exercise of ordinary care could have known, the silent oncoming Wabash locomotive was imperiling respondent's safety; and that he (the engineer) could thereafter in the exercise of ordinary care have given respondent timely warning and thereby prevented respondent's injuries, but negligently failed to do so. In our opinion instruction No. 1 thereby charged by clear implication that appellant's engineer owed respondent the duty to watch for and warn him of the approach of the Wabash locomotive. Appellant makes the further contention that instruction No. 1 was not cured of its error by instruction No. 2. But as stated, we think instruction No. 1 was not erroneous.

Still further appellant contends respondent's instruction No. 1 erroneously submitted in the conjunctive two theories of recovery which were directly conflicting, viz.: (1) failure to exercise proper care to furnish respondent a reasonably safe place to work; (2) failure of appellant's engineer to warn respondent. This first duty, says appellant's brief, is a non-delegable duty of the employer, and "cannot be insulated against" by performing the second duty of *warning* the employee of the unsafety of the place of work. Hence the brief concludes "the two theories are repugnant."

We do not understand this reasoning. It is true instruction No. 1 did submit the hypothesis that the space between the parallel tracks and locomotives passing thereon at the switch stand was too narrow and rendered respondent's place of work unsafe; and it also submitted in the conjunctive the hypothesis that appellant's engineer negligently failed to warn respondent of the silent and rapid approach of the Wabash locomotive. But we cannot see how or why the two theories of recovery were repugnant—as appellant contends. There was evidence from which the jury could find for respondent on both or either of the two ▮▮▮▮ hypotheses—unsafe working place and failure to warn. And both could have been true. A prompt warning could have averted the casualty notwithstanding the place of work was unsafe.

Appellant's argument against this view is that since the duty of furnishing a reasonably safe place of work is a non-delegable duty of the employer, therefore it is not liable when the unsafety of the place is due solely to the acts of fellow servants, citing Graczak v. St. Louis, 356 Mo. 536, 540(1), 202 SW. (2d) 775, 777(7), which in turn quotes 4 Labatt, Master & Servant (2 ed.) §§ 1531, 1537. This contention may be true in cases to which the fellow servant doctrine is applicable, but as further pointed out in the Graczak case, 356 Mo. 1. c. 544, 202 SW. (2d) 1. c. 780(9), the fellow servant doctrine has been abolished in personal injury suits against railroad corporations by Sec. 3665, R. S. Mo. 1939, Sec. 537.180 R. S. 1949, and the instant suit is against a railroad corporation.

▮▮ Defendant-appellant Terminal's next assignment of error runs in the disjunctive, and complains that the trial court erred in refusing to give to the jury its requested instructions "F *or* G *or* H *or* I", on the plaintiff-respondent's burden of proof. All these instructions were lengthy. Instructions F and G both contained five paragraphs. They were identical except for paragraph 2, clause 4, of each. The first three clauses of that paragraph in both instructions required the respondent Timmerman to establish: (1) that the space between the two railroad tracks was inadequate and unsafe for switching; (2) that the defendant-appellant Terminal knew or should have known it; (3) and that it could by reasonable care have made the place reasonably safe. Next, clause 4 in instruction F required respondent to establish that "defendant (Terminal) failed so to do." But in instruction G that clause 4 required respondent to prove "*how* defendant by the use of ordinary care could have made said place reasonably safe." Then followed two clauses 5 and 6 requiring respondent to show that defendant "failed so to do"; and that respondent's failure to use due care in the premises in whole or in part proximately caused his injury.

We can see no error in the refusal of these four instructions. As will be seen they were indefinite and confusing, and the court's given

instructions No's 1 and 2 required the jury to find from a preponderance of the evidence the facts necessary to respondent's recovery. Appellant refers to two decisions which it says state the correct rule on burden of proof in cases such as this. We cite them here, but are unable to see that they show any error in this case. Doherty v. St. L. Butter Co., 339 Mo. 996, 1003(2), 98 SW. (2d) 742, 744(2); Montgomery v. Ross (Mo. Div. 2) 218 SW.(2d) 99, 103(7, 8).

. In particular, appellant asserts that among the facts necessary to be shown before respondent could recover under the "safe place" rule was the fact that it (appellant) had knowledge of the unsafety of the place of work and time and ability to repair it. And it is argued the court erred in refusing the four instructions last aforesaid so declaring, because there was no evidence that appellant had such knowledge, or notice, and time to repair. We do not agree. The undisputed evidence is that the restricted switching area at the switch stand in question had existed for many years, and that there was ample evidence that the custom for appellant's engineers to warn switchmen of the silent approach of Wabash engines had continued long enough to become a practice.

Furthermore, these four instructions dealt only with respondent's charge of violation of the safe place rule and directed a verdict for defendant-appellant on that ground, ignoring respondent's other charge, pleaded conjunctively, that appellant's engineer failed to keep a lookout and warn respondent. Under that instruction respondent's submission of both issues to the jury was not reversible error. Lindquist v. K. C. Pub. Serv. Co., 350 Mo. 905, 909(2), 169 SW.(2d) 366, 368(2).

█ Appellant's last assignment is that the verdict was excessive. The jury's verdict awarded respondent $50,000 damages. The trial court ordered a remittitur of $15,000 ██ on pain of granting a new trial, and the respondent entered the remittitur, the judgment being for $35,000. Appellant's brief does not argue the facts on this point, but cites Mauck v. A., T. & S. F. Ry. Co. (Mo. Div. 2) 154 SW.(2d) 73, 78(9) where the jury's verdict was for $42,500 and this court enforced a remittitur of $20,000, reducing the judgment to $22,500. That plaintiff's annual earnings were about $3500. His injury occurred in July, 1938 and the case was heard in 1941. He was the fireman of a locomotive known as a "rough rider." He was thrown against a metal casting in the cab and struck in the lower back. His injuries were painful and mainly to his back, legs and sacroiliac joint, with some calcification of the 2nd, 3rd and 4th lumbar vertebrae, and a definite arthritic condition in the back which prevented him from reaching the floor.

In the instant case the respondent was 53 years old. His annual earnings when injured were about $3600 per year. Soon afterward the wage scale for his class of work was increased about $288 per year.

He testified his injuries were to his head, left hand, leg and knee, which jumps out of place ever since the casualty. He had a hole in his head and still has scars on his head and face; his nerves are upset, and he has constant headaches and cannot sleep.

Two physicians and one surgeon testified for respondent—apparently mainly as experts, since he was injured on June 25, 1948 and the first of these medical men did not see him until nearly six months later, in December, 1948, and four times thereafter in April, July and November, 1949. One physician first examined him in October, 1949 and the other, a specialist in nervous and mental diseases, in April and on November 10, 1949, four days before the trial. All of the physicians thought the injury to respondent's knee was permanent. One said surgery would be necessary to restore the nerve injury to his hand, and that it might be only partially successful. Another said he had suffered a post-traumatic neurosis manifested by anxiety, depression and headaches. X rays showed some bone degeneration of the sixth cervical vertebra, which would be permanent, as would the pain in the head and neck.

Respondent cites on this question of excessiveness of the verdict Tatum v. G., M. & O. Rd. Co., 359 Mo. 709, 726-9(11), 223 SW.(2d) 418, 426-8(12), where a verdict for $50,000 for injuries to the spine and pelvis of a brakeman who fell off a railroad bridge, was ordered reduced $7,500 by remittitur and left standing at $42,500. The injuries there were not the same as here. But the discussion in that case [359 Mo. l. c. 720(1), 223 SW. (2d) l. c. 421-2] of the view taken by United States Supreme Court decisions regarding the narrow latitude allowed appellate courts in reviewing close questions of liability in Federal Employers' Liability cases decided by trial courts and juries, is worthy of note. In view of these precedents and the shrinkage in the purchasing power of the dollar, we do not feel justified in ordering a further remittitur, and the judgment below is affirmed. All concur.