**Marion LAMONT, Appellant,**

v.

**Guy A. THOMPSON, Trustee, Missouri Pacific Railroad Company, a Corporation, Respondent.**

**No. 45651.**

Supreme Court of Missouri,
Division No. 1.

June 10, 1957.

Motion for Rehearing or to Transfer to
Court en Banc Denied July 8, 1957.

Ray D. Jones, Jr., Kansas City for appellant.

Richard H. Beeson, David P. Dabbs and Dean F. Arnold, Kansas City, for respondent.

VAN OSDOL, Commissioner.

Plaintiff instituted this action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for $50,000 damages for personal injuries sustained when, as a switchman, he was assisting in a switching movement in defendant's switchyards situate west of Topping Avenue in Kansas City. Although plaintiff had alleged several omissions of defendant as entering into the cause of his injury, plaintiff submitted his case to the jury on alleged negligence of defendant in failing to furnish a reasonably safe place to work, specifically, in that the interval between switch tracks at the place of his injury was narrow, insufficient, and in an unlighted condition. The jury was unable to agree, and the trial court declared a mistrial. Thereafter, the trial court sustained defendant's motion for judgment for defendant in accordance with defendant's motion for a directed verdict, and entered judgment for defendant. Plaintiff has appealed, and herein contends the trial court erred in entering judgment for defendant. It is asserted there were probative facts supporting the inference of defendant's causative negligence as submitted.

Defendant's Topping Avenue switchyards in Kansas City lie in a general east-west direction. Looking westwardly from Topping Avenue, one may see defendant's main line on the left (south). The first train yard lead track, providing for switching movements to and from the tracks of defendant's first train yard, is north of the main line. Several tracks, curving to the left (southwestwardly) from the first train yard lead, form in parallel alignment and constitute the tracks of the first train yard. To the right (north) of the first train yard lead is defendant's second train yard lead providing for switching movements to and from the tracks of defendant's second train yard which lies west of the first train yard. The first and second train yards are laid out for classification work in making up trains. A crossover switch is provided for the movement of cars from the first train yard lead over to defendant's "hold" or storage yard which lies north of defendant's classification yards. Plaintiff was injured west of the switchstand near the point where the crossover switch track leaves the second train yard lead and curves northwestwardly for movements to the storage yard. At this place, the north-south distance or interval between the north rail of the first train yard lead track and the south rail of the second train yard lead track is nine feet and eleven inches. There was evidence that the overhang of a boxcar is approximately two and one-half feet (plaintiff said "thirty-two inches, around that") so that, when boxcars are moving on both the first and second train yard leads by the place where plaintiff was injured, there is a clearance space of something in excess of four and one-half feet. A witness for plaintiff referred to the clearance as "about five feet." Defendant's witness, Waggoner, spoke of the clearance space as "regular." Plaintiff introduced no evidence relating to engineering, operative or safety problems in the construction, maintenance and operation of switchyards.

Plaintiff was not quite twenty-four years old when injured. He had worked for defendant sixty days, although he had had experience as a student switchman in service of another carrier.

There was evidence tending to show that at approximately four-thirty on a February morning plaintiff was the "pin puller" of a

switching crew working in the second train yard. The other members of the crew were the engineer, the fireman, the foreman, and the field man. Plaintiff rode the engine eastwardly to Topping Avenue. The engine was headed eastwardly on the east end of a unit or train of thirty boxcars destined for defendant's storage yard. The switches had been lined for the movement to the storage yards and, as the train was again being shoved back westwardly through the cross-over switch leading to the storage yard, plaintiff was riding the south side of the second or third car from the engine. The foreman and field man, working on the southerly side of the train, were to the northwestward. When plaintiff (riding the train which was moving slowly—three or four miles per hour—through the cross-over switch curving northwestwardly) had come to a point just west of the switchstand at the cross-over switch, he stepped off so as to maintain contact between the engineer and the foreman, who, as stated, was around the curve· to the northwestward.

Meanwhile, there was an independent switching movement on the first train yard lead. The switch crew was doing classification work for the first train yard. The switch crews of both switching movements were working on the right-hand—the engineers' (south) —sides of their respective trains, so that signals of switchmen operating on the first train yard lead were not ordinarily observable by switchmen working in the switching movement on the second train yard lead. A witness for plaintiff testified that every switchman is trained to expect the movement of a car or cars on any track in the classification yards at any time. Plaintiff had seen the other train unit standing on the first train yard lead, but saw no signal and heard no warning indicating that a boxcar was to be or had been shunted or kicked westwardly on the first train yard lead. But, on the first train yard lead, a boxcar was shunted for movement westwardly to some classification track in the first train yard. When first seen by defendant's engineer, the boxcar was moving on the first train yard lead "slightly back" of the engine on the second train yard lead, at a speed of three to five miles per hour.

Having stepped off the boxcar of his train on the second train yard lead, plaintiff stepped or backed southwardly to some point where his back was in a position to be struck by the northwest corner of the boxcar moving on the first train yard lead. Plaintiff testified he alighted from the train, took one or two steps, maybe three, got his balance, was possibly leaning to the left, and was standing there looking; and just as he saw the man in the field, he was hit in the back, and knocked down and was injured.

It was proper for plaintiff in the performance of his duties to alight "somewhere there in that neighborhood," in order to keep contact with the engineer and with the man or men in the field, but there was evidence that switchmen usually ride farther down "so they will have more room to get on and off."

The engineer of the train on the second train yard lead saw plaintiff move to the point where he was in the pathway of the overhang of the boxcar on the first train yard lead. When plaintiff stepped from the train on the second train yard lead, the boxcar on the first train yard lead, moving three to five miles per hour as stated, was approximately twenty feet from plaintiff. In the judgment of the witness, however, it was somewhere between three and five seconds after he saw the boxcar moving on the first train yard lead until the car struck plaintiff. The engineer testified he had insufficient time to warn plaintiff of the boxcar's approach, and plaintiff "might have run and got hurt worse if I had of hollered."

With respect to lighting conditions, defendant's engineer, witness for plaintiff, said, "Well, it is not really dark, too awful dark there. We have a floodlight at Topping Avenue which lights it up some, but

it is still dark." The engineer said that any floodlight might obscure the vision when one looks into it, but the floodlight (beaming east and west near Topping) "is a pretty good light." Plaintiff said, "There is a floodlight out there, but it is considerably dark." Exhibits, photographs, disclose three floodlights designed to cast illumination to the westward. The lights are set at the top of a metallic tower "about forty feet" high. The floodlight stand or tower is fifteen or eighteen or twenty car lengths from the point where plaintiff sustained his injury. The tower is so situated forty or fifty feet west of Topping Avenue as to be in approximate east-west alignment with the space or interval between the first and second train yard leads at the place where plaintiff was injured. The floodlights were lighted at the time plaintiff was injured.

Other facts will be considered in the further course of this opinion.

The question of the submissibility of a plaintiff's case in an action under the Federal Employers' Liability Act is to be approached in the light of the decisions of the Supreme Court of the United States. The Supreme Court of the United States has said the Act does not make the employer the insurer of the safety of his employees; and the basis of the employer's liability is his negligence, not the fact that injuries occur. And in this connection, it is the clear Congressional intent that, to the maximum extent proper, factual questions in actions arising under the Act should be left to the jury; that such cases may not be taken from the jury merely because the question of liability is close or doubtful; that the jury has the right to make all reasonably possible inferences from such probative facts in the evidence as the jury chooses to accept; and that it is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from a jury on the theory that the court gives equal support to inconsistent and uncertain inferences.

Howard v. Missouri Pacific Railroad Co., Mo.Sup., 295 S.W.2d 68, at pages 71–72, and cases therein cited.

In supporting the contention that plaintiff made out a submissible case, plaintiff-appellant cites cases including Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (in which case it was said it was not unreasonable for a jury to conclude that, in the circumstances of the failure to ring a bell when the engine was about to move, as required by respondent Company's rule, constituted negligence); Tiller v. Atlantic Coast Line R. Co., 318. U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610 (the tracks in respondent Company's switchyards allowed plaintiff, who was inspecting seals on passing cars, three feet, seven and one-half inches of standing space when trains were moving on both sides; the night was dark and the yard unlighted; and no special signal or warning was given); Beattie v. Monongahela R. Co., D.C., 122 F.Supp. 803 (the evidence is not set forth in detail in the opinion—plaintiff's theory was that the engineer had failed to perform his duty to sound a signal warning plaintiff of a car's approach to a close clearance area—so close, it seems, that the car caught and crushed plaintiff "between said car and an adjacent building"—it was said there was ample evidence to require the submission to the jury the question of whether or not the engineer's failure to give a proper signal warning plaintiff of the approach of a car, and defendant's failure to eliminate a close clearance area combined to make plaintiff's place of work unsafe). In Cleghorn v. Terminal R. Ass'n of St. Louis, Mo.Sup., 289 S.W.2d 13, as in Luthy v. Terminal R. Ass'n of St. Louis, Mo.Sup., 243 S.W.2d 332, switchstands, dark in color, located in plaintiffs' places for work in switching in the darkness of night were not lighted, and no lights of any kind cast illumination into the area. The case of Huffman v. Terminal R. Ass'n of St. Louis, Mo.Sup., 281 S.W.2d 863, involved a slick, oily and unlighted area wherein plaintiff was in the

performance of his duties as a switchman. In Hughes v. Terminal R. Ass'n of St. Louis, Mo.Sup., 265 S.W.2d 273, plaintiff was engaged in switching a regular movement of cars and stepped in front of and was struck by an "irregular" northbound movement of diesel locomotives coming through the "slip." The clearance between cars moving on the parallel north-south tracks was three and one-half feet, and there was evidence and the submission that no warning was given of the approach of the locomotives. In Timmerman v. Terminal R. Ass'n of St. Louis, 362 Mo. 280, 241 S.W.2d 477—a case greatly relied upon by plaintiff-appellant—the interval between the east rail of the west (Wabash) track and the west rail of the east (Terminal) track was eight feet, and the overhang (thirty-two inches) of each of the engines reduced the space for work in throwing a switch to two feet, eight inches.

We doubt the evidence as developed in the instant case, considered from a standpoint most favorable to plaintiff, supported the submission of negligence in failing to provide plaintiff a safe place to work on the specific hypotheses that the place of work was of insufficient space and in an unlighted condition. The evidence tends to show plaintiff was obliged to alight in the neighborhood of the place of his injury in order to maintain communication with the engineer and with the man in the field. But we think it would be too much to say from the evidence in this case that it was to have been reasonably foreseen that a switchman could not and would not with safety alight from his train within the space at the place where plaintiff was injured. There was no substantial evidence tending to show the dangerous proximity of the tracks involved herein, other than the fact that plaintiff was injured at the place in question. There was in fact evidence that the space between the tracks at such place was not inadequate for alighting safely from boxcars in making switching movements. For example, the engineer, witness for plaintiff, said switchmen alighting from a boxcar moving three or four miles per hour take about "one step to clear, that is about all." Neither was there evidence that the place was unlighted; on the contrary, the evidence indicates there was adequate light for the observation of the movement of cars and of the position and movement of switchmen in pursuing their work, although it is true the evidence shows the light was not like daylight, and one could not from any great distance see the facial features of persons engaged in a switching operation. Considering the work plaintiff was doing in attempting to maintain signalling communications with the men in the field, one would not suppose that a switchman, having alighted where plaintiff did, would "back up" southwardly in endeavoring to look around the northwestwardly curving movement of his train, in view of the space to the westward whereto switchmen could and would ordinarily move and wherefrom a switchman could more readily see a man in the field around the curve of the train to the northwestward. Plaintiff's place of work was not confined to the very place where he alighted and was injured. As we have seen, the cases cited by plaintiff-appellant are readily distinguishable. For example, in examining the Timmerman case, we have noted there was evidence that the particular space or interval in which plaintiff Timmerman was actually obliged to do the work of throwing a manually operated switch mechanism was approximately two feet, eight inches. The rapidly moving Wabash diesel struck plaintiff. The space in which plaintiff Timmerman had alighted and in which the switchstand was located was between defendant's switch track and the track of the other carrier (the Wabash), which latter track, it is readily inferred, accommodated rapidly moving trains. There was ample evidence of a custom for defendant's switch crews to warn those working at the switch in question of the approach of trains on the Wabash track, in the event the Wabash engine crew failed to warn.

Among other issues of alleged specific negligence which were not submitted in plaintiff's verdict-directing Instruction No. 1, was the issue of alleged negligence of defendant in failing "to warn plaintiff, under the conditions then and there existing, of the approach of the car on the first train yard lead." We have noted the testimony of the engineer that he saw plaintiff in the path of the moving boxcar three to five seconds before plaintiff was injured. The engineer made no attempt to warn plaintiff. It is obvious that, in this case, plaintiff's failure to request the submission of negligence in failing to warn plaintiff of the danger, in the circumstances including the fact or circumstance of the boxcar's approach, was not with the purpose of securing the strategic advantage of avoiding the defense of contributory negligence, as was the abandonment of pleaded primary negligence and the request of submission of negligence under the humanitarian rule in Smith v. St. Louis Public Service Co., 364 Mo. 104, 259 S.W.2d 692, and in Hunt v. Chicago, M., St. P. & P. R. Co., 359 Mo. 1089, 225 S.W.2d 738. We think the failure to submit the issue of failure to warn was due to the misadventure of overlooking or failing to appreciate the significance of the evidence tending to support the issue. In the exercise of discretion, we give effect to the general principle that, in the furtherance of justice, a case should not be reversed without remand "unless the appellate court is convinced that the facts are such that a recovery cannot be had," that is, if plaintiff has shown a state of facts which might entitle him to recover if his case were submitted on a proper theory. Smith v. Terminal R. Ass'n of St. Louis, Mo.App., 160 S.W.2d 476, at page 479. See also Houfburg v. Kansas City Stock Yards Co. of Maine, Mo.Sup., 283 S.W.2d 539; East v. McMenamy, Mo.Sup., 266 S.W.2d 728; O'Neal v. Mavrakos Candy Co., 364 Mo. 467, 263 S.W.2d 430; Cudney v. Midcontinent Airlines, 363 Mo. 922, 254 S.W.2d 662.

The judgment should be reversed, and the cause remanded.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.