MAMIE LEE DERRINGTON, Administratrix of Estate of ARCH DERRINGTON, v. SOUTHERN RAILWAY COMPANY, Appellant.—40 S. W. (2d) 1069.

Division Two, July 3, 1931.

284

*Kramer, Kramer & Campbell* and *Samuel B. McPheeters* for appellant.

*C. O. Inman* and *W. H. Douglass* for respondent.

288

WHITE, P. J.—This suit was brought by plaintiff, administratrix, under the Federal Employers' Liability Act, the petition alleging negligence of the defendant which caused injuries to Arch Derrington from which he died in about two hours, and during the interval between the time of the injury and his death caused him to suffer severe conscious physical and mental pain. She recovered judgment for $14,000 in the Circuit Court of the City of St. Louis, and the defendant appealed.

The injury occurred in Tennessee just east of Memphis in what is called the Forest Yards of the defendant, Southern Railway Company. There were two of those yards, A and B, Yard A lying north of Yard B. Six parallel tracks ran east and west across Yard B, numbered, from the south to the north, tracks B-1, B-2, B-3, B-4, B-5 and B-6. The parallel tracks in Yard A were numbered from the north to the south so that track 9 on Yard A was next to and parallel with track B-6 on Yard B where the injury occurred. The distance from the center of track B-6 to the center of track 9 was twelve feet and eight inches, leaving a space of about eight feet between the inside rails of those tracks. A "lead" track ran diagonally from the southwest to the northeast across Yard B. What was called a "cross-over track" ran diagonally from track B-4 to the northwest across tracks B-5 and B-6 on to track 9. A switch called a "three-way switch" was between track B-5 and track B-6, and used to divert cars from track B-6 to track 9. Track B-6 was

a storage track, used to put what is termed industry stuff in the west end of the yard, the stuff going to factories over the city. Track 9 was used for empties.

On the night of January 23, 1928, a train of fourteen cars was passed up the lead from the southwest to the northeast onto track B-6 at the east end of the yard, and then was backed down track B-6 to the west. The engine fronted west and was at the east end pushing the cars ahead. Arch Derrington was what is called a field switchman and rode the front car going west. Another switchman, called the head switchman, was with the engine. It was after midnight, the early morning of January 24th, when that train of cars on track B-6 approached the cross-over track. The switch had been thrown so as to align track B-6 with the cross-over track, so that it diverted the train to the cross-over. The cross-over track ran on to track 9 at an acute angle. Some cars stood on track 9 so close to the junction between the cross-over and track 9 that Derrington, who was riding the latter on the right-hand side of the front car moving west, was crushed to death when the car on which he rode rubbed against the car on track 9. In the language of the trainmen his car was "side-swiped" by the car on track 9. His body was taken from under the car at that point and he died a few hours later.

I. The appellant filed a demurrer to the evidence at the close of the case and asserts error in action of the trial court in overruling it. The plaintiff alleged in her petition that a custom prevailed among the defendant's employees operating cars in Yard B to leave track B-6 always aligned for a straight passage through from east to west; that Derrington relied upon that custom when his train was pushed along track B-6 that night, and that the defendant was negligent in violating that custom by allowing track B-6 to be aligned with the cross-over. Appellant claims here that there was not sufficient proof of that custom.

It was testified by D. R. Derrington, a brother of the deceased, that it was the custom to leave tracks 9, B-6 and other tracks lined up straight. That tracks B-6 and 9 both stayed in the center all the time. That in moving cars from east to west to track B-6 it was not necessary to examine to see whether it was so lined. There was no need to examine it, everybody knew it was always lined center, which means aligned for cars to continue on track B-6.

It is first claimed that the witness wasn't qualified to testify to a custom; that in order to prove a custom of the kind claimed it must be uniform, continuous and known to the parties affected. The witness testified that he had been at work on the yards eight years that he had worked during that eight years in every shift on the yard; that he observed the conduct of the ship-

ping crews in reference to track B-6; that the cross-over to track 9 was hardly ever used; that he saw that switch one to several times every day; had seen cars kicked in on track B-6 every day; that he himself put cars through on track B-6 that very day; he was across the yard there that day; he saw the switch at eight o'clock that night, aligned for straight track on B-6; his shift in the yard was from 2:30 to 10:30 at night; he passed there at the end of his shift.

He was qualified to testify to the custom. The witnesses for the defendant, yard men, who were no better acquainted with the situation than Derrington, testified that it was the general custom in a yard to leave all inside switches as they were last used and that it was the duty of the field men in the position occupied by the deceased to see that the switches were aligned right before passing over them.

It is claimed further by the appellant that the witness contradicted himself, and so impaired his direct statement that the court should have sustained a demurrer to the evidence. On cross-examination, he was asked if he knew what the custom was with the Sibley crew that his brother worked with before his death; whether they left track B-6 lined up. He said he didn't know about that. He was asked then if he knew anything about the custom of the Sibley crew. He said: "No, sir." He had just said that he didn't suppose his brother worked in that part of the yard at all only to "pull in" there. What he meant by "pull in" apparently was shoving cars back westward on the tracks. His saying that he didn't know the custom of that crew was in answer to leading questions. His further examination shows that he meant he wasn't with that crew and did not know whether or not on some occasions they did or did not observe the custom.

The appellant at this point cites authorities from the Federal courts and claims that in order to make out a case the proof must be more convincing in cases under the Federal Employers' Liability Act than is required in Missouri courts, in other cases; that a scintilla of testimony is insufficient, and there must be substantial evidence. One of the cases cited by appellant is Western & Atlantic Railroad Company v. Hughes, 278 U. S. 496. In that case the court said, l. c. 498:

"It is the duty of the judge to direct the verdict when the testimony and *all inferences which the jury could justifiably draw therefrom* would be insufficient to support a verdict for the other party." (Italics ours.)

In another case cited by appellant, Gulf, etc., Railroad v. Wells, 275 U. S. l. c. 459, the Federal Supreme Court said this:

"We find that on the evidence and *all the inferences which the jury might reasonably draw therefrom, taken most strongly against*

*the Railway Company,* the contention that the injury was caused by the negligence of the engineer is without any substantial support." (Italics ours.)

The rule stated in those authorities is exactly the rule that obtains in Missouri. Applying that principle here, the evidence of Derrington was not merely a scintilla but was substantial and it does not stand alone.

The first witness for the appellant, Mr. Hodgkins, superintendent of the terminals, testified that track No 9 was usually filled with cars; that the cross-over track from B-6 to 9 was very rarely used. It was said by other witnesses for the appellant that most of the movements on B-6 track were straight movements east and west. Some of these witnesses said further that the same switch was aligned in the same way for a movement of cars from west to east from B-6 on to cross-over on to B-5, but Derrington in his testimony denied that that switch was so used; that they hardly ever used the cross-over from B-6 to B-5, but did use it from B-5 to B-4 and B-3. It was admitted by appellant's witnesses that the leads were left open, but they denied that the storage tracks were left open. Two of defendant's witnesses, on cross-examination, were asked if they were using the switch, to make the cross-over from B-6 to track 9 going from east to west; each witness stated that they were not using it at the "present time;" that the rails were put in position and spiked down so that the west movement would have to continue on the straight track. When plaintiff's counsel asked why the change had been made since the accident, defendant objected and the objection sustained.

As a general rule evidence is inadmissible to show subsequent repairs of defect which caused an injury for the purpose of proving negligence, but such repairs may be shown for various reasons, depending upon the circumstances. [45 C. J. 1234, 1235, 1236; Schloemer v. Transit Co., 204 Mo. 99; Bailey v. Kansas City, 189 Mo. l. c. 511; Marshall v. Kansas City, 297 Mo. l. c. 317; Brennan v. City of St. Louis, 92 Mo. l. c. 488; Bianchetti v. Luce, 2 S. W. (2d) l. c. 136; Boonc v. St. Joseph, 1 S. W. (2d) l. c. 229; Bujalo v. St. Louis Basket & Box Co., 227 S. W. l. c. 846.]

Here, however, the evidence that the cross-over from B-6 to 9 was no longer used, was volunteered by defendant's witnesses; and when asked *why,* defendant objected and they did not answer. The jury had a right to draw an inference unfavorable to defendant from that concealment; that the condition before the accident was dangerous; that defendant did not rely upon an alleged custom to leave the switch as last used to prevent such an injury as that which occurred; that the cross-over track was unnecessary; circumstances tending to show the propriety and even necessity of the custom sworn to by plaintiff's witness.

292

The defendant introduced two photographs to show the situation of the switch between tracks B-6 and B-5. The camera was placed 65 feet west of the switch and pointed east. It was placed at a point east of where the cross-over connects with track 9, so that the point of contact, the place where Derrington was hurt, is not shown on the photographs. Both photographs were taken from the same point merely to show the position of the switch as seen from the west. Naturally we would expect such a photograph to be taken with the camera facing the west so as to show the situation as it appeared to Derrington as he approached the switch. In short, the photographs reveal nothing of the situation as it would appear to one on a train backing up from the east to the west. The jury might very easily infer that these photographs did not fairly represent the situation.

Derrington was contradicted by several of defendant's witnesses, but they gave conflicting testimony as to how much or how often the cross-over at that point was used and as to how much it was used to push cars from track B-6 to track B-5. Upon the whole there was substantial evidence upon which the jury could find that the custom testified to by Derrington prevailed and that the deceased had a right to rely upon it in passing cars back from east to west.

II. Appellant makes the point that it is not pleaded and the evidence does not show that the deceased *knew* of any such custom and cites a number of cases to the effect that a custom in order to be relied upon must be known. In all such cases it is where the person claiming the custom was not the one who was obliged to observe it. For instance, a passenger, or a person crossing the railroad track, in order to rely upon a custom which would protect him, would have to know that there was such custom. In this case the custom relied on was one which the deceased was presumed to know, was obliged to know. He relied upon it in the very movement in which he met his death. The demurrer to the evidence could not have been sustained on the ground that the proof did not show that he knew of the custom.

This, also, disposes of the point that the decedent's negligence conclusively was the sole cause of his injury and death. The appellant quotes some evidence which it introduced to show that he was apprised of the situation; that he inquired about whether the track was lined up; evidence which the jury was not obliged to believe. It was a question for the jury.

III. Appellant complains of certain instructions. Instruction 1 given for plaintiff authorized a verdict for plaintiff on finding the existence of the custom sworn to by plaintiff's witness, and failure

of defendant to observe it, or the jury could find for plaintiff if it was practicable to have lights which would reveal the position of the switch and defendant negligently failed to have such lights. The evidence showed that formerly there were lights at the switch, but appellant's witnesses testified that they had been discontinued years before, that it was impracticable and served no useful purpose to have lights *at the switch*. There was evidence tending to show that it was practicable to have lights somewhere which would reveal that situation. D. R. Derrington swore there were arc lights along the sides of the yard, north and south. At the time of this injury there were cars on tracks B-5 and 9 so that these lights were not thrown on the switch. The evidence shows it was a dark night. As a matter of common knowledge lights could have been placed somewhere high enough or suspended in some sort of position so as to show the position of the switch. If it was the custom, as testified to by defendant's witnesses, to leave the tracks aligned as last used, and if it was dangerous for cars backing in from the east on track B-6 and other tracks to be switched on to the cross-over, then it was for the jury to say whether the defendant was negligent in failing to have such lights. Derrington would have been killed in exactly the same way if, instead of intending to push the cars westward on track B-6, he had intended to take the cross-over; the cross-over slopes gradually to connect at an acute angle with track 9 and cars stood on track 9 so close to the connection that cars coming down the cross-over were bound to be side-swiped by them. It was a dangerous condition with cars so on track and the switch turned to have cars going up B-6 to take the cross-over. It was the seldom use of the cross-over and the usual occupation of track 9 by cars standing along on it which made the custom to leave track B-6 aligned for through passage necessary. But if there was no such custom, it was for the jury to say whether ordinary care required defendant to have lights so that operatives driving cars on B-6 would know how the switch was turned, and it was for the jury to say whether such lights were practicable. If the jury found the custom, it did not matter what they found about the lights. It was only necessary to find negligence in the absence of lights in case there was no custom to leave track B-6 lined for through traffic.

Complaint is made of the refusal of instruction numbered 15 asked by defendant. This instruction was modified and given by the court as Instruction XI, and reads as follows:

"You are instructed that even if you believe from the evidence that the switch in question was not lighted at the time in question, yet if you also believe from the evidence that such switch had not been equipped with lights for several years prior to deceased's fatal injuries and that such fact, if it was a fact, was known to deceased, or was (so) plain and (so) obvious

*to him* (that an ordinarily careful person in his situation would have appreciated the danger, if you so find, of not having a light on said switch, if you find it was dangerous), then and in that case plaintiff cannot recover in this case on account of any failure to have lighted lights on the switch at the time in question.''

The modification was the insertion of the parts in parentheses, and omission of the words ''to him'' underscored, and it correctly placed before the jury the defendant's duty, if any, in regard to lights.

Defendant offered the court refused instruction numbered 17, which told the jury that if the deceased's fatal injuries were caused solely by his own negligence, and defendant was not guilty of negligence which contributed directly to his fatal injuries, then the verdict must be for the defendant. By that instruction the negligence of deceased which would authorize a verdict for defendant was not limited to the negligence alleged and proved by defendant, but allowed the jury to find against plaintiff for *any* negligence of deceased which the jury might conjecture without pleading or proof. The court gave Instruction VIII asked by defendant and it covered the point specifically. Besides the court gave Instruction 17 modified so as to read:

''You are further instructed that if you believe from the evidence that defendant was not guilty of negligence which contributed directly in whole or in part to deceased's fatal injuries, then your verdict must be in favor of the defendant.''

Appellant has no ground for complaint.

The appellant complains of the refusal of its Instruction No. 2, which told the jury that if they believed the injuries to the deceased were caused by a risk ordinarily incident to his employment, which was known or obvious to him, that plaintiff could not recover. That instruction states an abstract proposition of law. It leaves the jury at sea as to what risks are ordinarily incident to the plaintiff's employment. It does not either by mention of particulars nor by any general statement inform the jury what was meant by ''ordinarily incident to his employment,'' nor confine them to the risks as pleaded, nor to the risks as proved.

Appellant complains of refused Instruction No. 3. Instruction No. VIII given by the court covers the point made. There the jury was told that if it was the duty of the deceased to line up B-6 track and he failed to do so, and if such failure was the sole cause of his injuries, then they should find issues for the defendant. The instruction asked by the defendant contained that, and, in addition, recited evidence which a fellow-switchman gave relating a conversation with the deceased. It was a comment upon the evidence and improper for that reason.

Instruction No. 4, asked by defendant, was refused by the court, and appellant assigns error. The court gave Instruction No. X in effect the same; it told the jury they should not be governed by prejudice or feeling, but should be governed solely by the evidence and instructions of the court. It was one of those cautionary instructions, which is entirely within the discretion of the trial court.

Complaint is made, also, of the refusal of defendant's Instruction No. 14, which was properly covered by Instruction No. VIII given by the court, as noted above.

Appellant complains of the giving of Instruction No. IV on behalf of the plaintiff. That instruction called attention to the defense alleging that the death of the decedent was caused by his contributory negligence, and told the jury that the burden is upon the defendant to prove the contributory negligence as the direct cause of his injury and death. The instruction is faulty in not directing the jury that his negligence must be the sole cause of his injury and death, but that fault was favorable to the defendant and it cannot complain on that count.

Defendant asked some withdrawal instructions which were refused, but the matters covered by such instructions were not submitted to the jury.

The case was a close one, but upon the whole the court conducted a fair and impartial trial and in some instances ruled against plaintiff improperly, but we find no reversible error against the defendant. The judgment is accordingly affirmed. All concur.