Samuel M. CLEGHORN (Plaintiff), Respondent,

v.

TERMINAL RAILROAD ASSOCIATION OF ST LOUIS, a Corporation (Defendant), Appellant.

No. 45020.

Supreme Court of Missouri. Division No. 1.

March 12, 1956.

Motion for Rehearing or to Transfer to Court en Banc Denied April 9, 1956.

16

Warner Fuller, Arnot L. Sheppard, St. Louis, for appellant.

Haley, Fredrickson & Caruthers, Rexford H. Caruthers, St. Louis, for respondent.

VAN OSDOL, Commissioner.

In this action brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., plaintiff Samuel M. Cleghorn had verdict and judgment against defendant Terminal Railroad Association of St. Louis for $11,885 for personal injuries sustained when he tripped and fell on a switchstand in defendant's Bremen Yard in St. Louis. Defendant has appealed.

Plaintiff's case was submitted to the jury on negligence of defendant in failing to furnish plaintiff with a reasonably safe place to work. The primary contentions of defendant-appellant are that plaintiff failed to make out a case of actionable negligence; and that the evidence did not support the hypothesis in an instruction submitting the issue of whether or not plaintiff was bound by a release. There are further contentions that defendant was deprived of a fair trial by the action of the trial court in denying defendant's challenges to sixteen veniremen; that the court erred in permitting plaintiff to testify of a practice of switchmen to carry their lanterns in a particular manner; and that plaintiff's counsel, in his argument, was erroneously permitted to attack the credibility of plaintiff's own witnesses. It is also contended by defendant-appellant that the amount of the verdict was excessive.

Plaintiff, forty years old when injured April 18, 1953, had been in defendant's employ as a switchman since 1940. Plaintiff reported for work at four o'clock in the afternoon, and took over his duties as a "hind" man of a switch crew working in defendant's Bremen Yard.

The principal tracks in the Bremen Yard are the Big Lead and the Big Foot lying in a general north-south direction. The Big Lead is east of the Big Foot. Various switch tracks connect with these tracks. The Big Lead is a main-line track. The Big Foot is a "pull-in" track—it is used for temporarily storing cars which are to be assembled into trains. The switchstand on which plaintiff fell controls the movement of cars in and out of switch tracks Nos. 9 and 10 in their junctures with the Big Lead. The switchstand is located between the Big Lead and the Big Foot, and is some two hundred twenty-five feet north of Bremen Avenue which crosses defendant's tracks in an east-west direction.

Plaintiff was injured at eight forty-five in the evening. It was then very dark. The switchstand was painted black. It had dirt and grease on it. The visibility was poor in the area. No target lights were on the bracket at the top of the

switchstand, nor were there other lights in the area. The illumination cast by lights on Bremen Avenue and by lights on buildings situate near Bremen Avenue did not illuminate the area.

Just prior to the time plaintiff was injured, a train was being made up on the Big Foot, and fourteen cars had been set temporarily on that track. The south end of the southernmost car was near the switchstand. The switch engine had moved southwardly on the Big Foot across Bremen Avenue, thence northwardly again to pick up three cars and a caboose on a switch east of the Big Lead in anticipation of coupling these cars and the caboose to the south end of the cars standing on the Big Foot. Plaintiff assisted in coupling the switch engine to the three cars and caboose, then walked southwestwardly and stood between the Big Lead and Big Foot tracks near the south end of the cars temporarily set on the Big Foot. He stood facing west, near and north or northwest of the switchstand. Meanwhile, the switch engine with the three cars and caboose had moved southwardly across Bremen Avenue and then over onto the Big Foot, thence northwardly until a coupling was made with the string of cars on the Big Foot. After the coupling was made, it was plaintiff's duty to move eastwardly across the Big Lead and other switch tracks to the eastward thereof, and there await the switch engine's return over onto the Walter's Lead.

The coupling having been made, plaintiff held up his lantern in a "cut-off" signal, pivoted to the eastward on his left foot, and started to stride with his right. His right foot "caught in the switch assembly, either the switch handle or the side, and I fell. I felt a terrific pain. * * * in my shin bone, in my (right) knee and my knee cap." He fell on top of the switchstand, struck his knee on the bracket "that would have held the target, and jammed my hand into the ground as I fell down."

Plaintiff testified that he was using an electric lantern with a rigidly adjusted bail. The lantern had two light bulbs at the bottom; one of the bulbs was "on." The lantern is used for passing signals. It is the practice for the lantern to be held "still" when not passing signals. "To move that lamp could be misinterpreted as a signal." Plaintiff had often worked in this yard and knew there was a switchstand and mechanism controlling the movements on and off tracks Nos. 9 and 10. He knows he could have seen the switchstand if he had used his lantern in looking for it.

Plaintiff had the burden of proving that defendant was negligent, and that such negligence was a proximate cause of plaintiff's injury. At common law the duty of the employer to use reasonable care in furnishing his employees with a safe place to work was plain, and the failure to use such care is negligence. Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S.W.2d 418.; Malone v. Gardner, 362 Mo. 569, 242 S.W.2d 516; Bailey v. Central Vermont Ry., 319 U.S. 350, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444. Due care contemplates the precautions commensurate with the dangers to be encountered in the circumstances or, as has been said by the Supreme Court of the United States in cases involving employers' requisite care in furnishing a safe place to work, " 'in all cases it is a question of the reasonableness of the care, reasonableness depending upon the danger attending the place or the machinery.' " Bailey v. Central Vermont Ry., supra.

The Big Foot track was utilized for making up trains necessitating the coupling of cars thereon, and plaintiff, the hind man of the switching crew, had the duty to make the coupling of the three cars and caboose onto the train being made up on the Big Foot. This work brought him to the immediate vicinity of the switchstand. Having coupled the cars, plaintiff, in moving to perform other duties, turned eastwardly and started to walk to some easterly part of the Bremen Yard. The circumstances that the switchstand was situate in an area furnished by defendant to plaintiff as a place of work; that the switchstand and the mechanism were unlighted, dark in color, and no lights of any

kind cast illumination into the area at the time; that by reason of these circumstances plaintiff's place of work was dangerous and not reasonably safe; and that, in so furnishing plaintiff with a place of work in such condition, defendant was negligent, were submitted to the jury in plaintiff's verdict-directing Instruction No. II. We believe that under the evidence it was a question for the jury whether a reasonably prudent employer would have taken the precaution to illuminate or mark the switchstand in some manner for the protection of employees engaged in switching movements in its vicinity in the nighttime. Luthy v. Terminal R. Ass'n of St. Louis, Mo.Sup., 243 S.W.2d 332.

■ Defendant's counsel is of the opinion that plaintiff in the Luthy case failed to make out a case for the jury and that the opinion of this court in that case should not be followed. We have carefully examined the Luthy opinion, and we believe the case was rightly decided. We regard that case as an authority supporting the submissibility of the issue of defendant's negligence in this case. It is true, as argued by defendant-appellant herein, there was testimony in the Luthy case that the switching mechanism over which plaintiff Luthy fell could have been painted with luminous paint, and there was no evidence in the instant case tending to show any practicable method of illuminating the switchstand and mechanism, nor was there evidence that it was customary for railroads generally to illuminate switchstands. It is also true that plaintiff Luthy, when he tripped over the switching mechanism, was running to catch and board a moving train, and, in our case, plaintiff Cleghorn merely, turned and took a stride with the intention of walking to another place in defendant's yard. The exercise of due care, however, requires precautions which a reasonably prudent employer would have taken in given circumstances, even though other employers may not have taken such commensurate precautions. What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not. Grosvener v. New York Cent. R. Co., 343 Mo. 611, 123 S.W. 2d 173. And we are of the opinion that it does not take the testimony of an expert witness or of any witness, Derrington v. Southern R. Co., 328 Mo. 283, 40 S.W.2d 1069, to advise a jury of a fact they already know as a matter of common knowledge, that is, we believe it is a matter of common knowledge that there are practicable methods of marking or illuminating a switchstand, and that in given circumstances the employer has a duty to do so, if in the circumstances a reasonably prudent employer would have taken such a precautionary measure to protect his employee from harm. On the issue of submissibility of plaintiff's case, we think the fact that plaintiff was walking and that plaintiff Luthy was running does not differentiate the instant case from the Luthy case. The jury reasonably could find that the failure to illuminate or mark the switchstand was at least "in part" the cause of plaintiff's injury, and plaintiff's failure to take the precaution of using his lantern in looking as he turned was a matter for the jury's consideration on the issue of plaintiff's negligence. The customary manner of handling the electric lantern was pertinent here. In this connection, we see no error in permitting plaintiff, an experienced switchman who had served defendant as a switchman for several years, to testify that the electric lantern is used for passing signals and that he had observed, during the years he had worked in defendant's yard, that switchmen held "their lamps still" when they weren't passing signals. An employee is engaged in the same business as the employer, and as between them a custom need not be proven with such fullness as would make it a rule at common law. McDill v. Terminal R. R. Ass'n of St. Louis, Mo. Sup., 268 S.W.2d 823, and cases therein cited.

Defendant-appellant has cited Brady v. Southern R. Co., 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239; Kloetzer v. Louisville & N. R. Co., 341 Ill.App. 478, 95 N.E.2d 502; Healy v. Central R. Co., D.C.N.Y., 35 F. Supp. 591; and Raudenbush v. Baltimore

& O. R. Co., 3 Cir., 160 F.2d 363, 367. These cases were also cited by defendant-appellant in the Luthy case, and they were correctly held to be distinguishable from that case, as they are from the instant case. Herein defendant-appellant additionally asserts the "degree of care to be exercised by a party must have some reasonable relationship to the ability of that party upon whom the duty is cast to perform such duty." This was the language of the reviewing court in the Raudenbush case, but in that case the question was whether the defendant railroad company was guilty of negligence in failing to remove ice and snow from the sill of a gondola car. The facts were that a " 'very, very thin coating' " of snow had fallen and the snowfall had ceased only an hour or an hour and a half before the employee was fatally injured. Considering the circumstances of the recentness of the storm and the slight nature of the snowfall, the reviewing court was of the opinion that defendant had no duty to remove the light fall of snow from the area of the employee's employment.

The issue of the validity of the release (executed May 15, 1953) was submitted to the jury on the theory that the release was executed under a mutual mistake of fact. As stated, defendant-appellant contends the issue was not submissible to the jury.

It was submitted in plaintiff's Instruction No. 1 that, when the release was executed, both plaintiff and defendant believed plaintiff's injuries were temporary and of a minor nature, consisting of contusions of the right knee and the right middle finger, and an abrasion of the right shin; but that, in addition to these minor injuries, a semilunar cartilage of the right knee was so torn as to require surgical removal, which latter injury was not known to both plaintiff and defendant but was substantial, serious and permanent, and that both plaintiff and defendant were mistaken in their beliefs as to the nature and extent of plaintiff's injury when the release was entered into.

Defendant-appellant contends that plaintiff's theory of a mistake of fact is falla-

cious. It is asserted the evidence does not show that plaintiff and defendant, when the release was entered into, were under the handicap of mistake. It is said the evidence shows that both plaintiff and defendant knew that plaintiff had an injury to the cartilage of the knee, and that the knee "locked" upon occasion. So there was neither a mistake of fact nor ignorance of the fundamental facts of plaintiff's physical condition. It was merely that neither plaintiff nor defendant could forecast the terminal result, and both were assuming the risk of the ultimate result of the injury. It is futher argued that the release conclusively shows the settlement was a compromise; and that the language of the release (discharging defendant from "all liability for all claims for all injuries, physical, mental or financial, including injuries, symptoms and conditions which may hereafter develop, as well as those now apparent * * * which I have or might have arising * * * from * * * the injuries and damages above referred to, present and future") was binding on plaintiff and defendant, regardless of the injurious consequences which may have followed.

These contentions make necessary a statement of the evidence bearing upon the nature, extent and development of plaintiff's injuries, and a statement of the circumstances of the execution of the release.

After he was injured, plaintiff was taken to the Missouri Pacific Hospital. He was suffering terrific pain, and his right knee "locked." The preliminary diagnosis as of April 20th was "contusion right knee and right middle finger." Plaintiff was discharged from the hospital April 20th, but within the next few days returned for further examination and treatment. The hospital record disclosed an entry of May 5th—"Complains of slight swelling and tenderness right knee. He states at times knee locks"; and an entry of May 12th, disclosed the notation—"Contusion to hand and right knee. Knee no longer locks. No further disability noted. To resume (work) 5/18/53." On May 12th, plaintiff received a certificate permitting his return

to work on May 18th. May 15th plaintiff went to defendant's claim office and talked to defendant's claims investigator, Melbourne J. Husman, and Mr. Husman presently referred plaintiff's claim to Harold H. Klein, defendant's general claim agent. Plaintiff signed a release, having been paid the sum of $450.

Plaintiff worked three of the nine working days between the 18th and 27th of May, 1953. In the evening of May 27th, plaintiff was playing ball with a neighbor and the neighbor's sons. While playing, the neighbor picked up the ball "and rolled it in to me. When I stooped to retrieve the ball, my (right) leg locked and I fell to the ground, and I couldn't get up." Plaintiff again went to the Missouri Pacific Hospital on May 28th where his knee was forcibly straightened, and on June 1st the medial semilunar cartilage of the right knee was removed by surgery.

The medial semilunar cartilage is attached on its extreme medial aspect to a strong ligament which goes from the thigh bone to the tibia to which the cartilage is also attached by means of a coronary ligament. The function of the cartilage "is to make deeper the cup in the main weight-bearing bone, or the tibia, which receives the rounded condyles of the thigh bone. In addition, it forms a support preventing * * * lateral motion, at the knee joint. It also has a third function, and that is to secure locking of the joint in full extension. This is ordinarily a very weak joint, the knee joint is, because of its structure, and the joint is only stable when it is locked in a full extended position."

Plaintiff was discharged from the hospital on June 8th, was on crutches three weeks, and used canes or a cane two weeks. He returned to work August 3d, having lost forty-nine working days since May 28th.

A physician, who examined plaintiff a few days before the trial, testified that plaintiff has a healed, nontender, postoperative scar three inches long at the site of the surgery. There is some tenderness over the medial knee joint line and slight relaxation of the collateral ligament. There is some crepitation in both knee joints—perhaps more severe on the right side—a kind of grating sensation in the joint. There is a decrease in space between the thigh bone and tibia on the inner aspect of the knee joint, and an inflammation of the right saphenous nerve. These conditions are permanent and are reasonably likely to produce episodes of pain in the future. The knee joint is not stable. The doctor testified that a contusion ordinarily is not an injury of a permanent nature, neither is an abrasion; but an injury in which the medial semilunar cartilage is torn so as to require surgical removal is considered a major injury.

May 14, 1953, the Missouri Pacific Hospital Association had issued a Surgeon's Injury Report to defendant. In the report, plaintiff's injuries were stated to be a contusion and superficial abrasion of the shin in the upper third of the right lower leg, some tenderness over medial aspect of the right knee and contusions of the right middle finger. In reporting the preliminary diagnosis, the report indicated there was no "permanent defect," and the report also contained the notation—"No Permanent Disability." Husman and Klein had this report at hand when they were talking to plaintiff about the execution of the release. In his preliminary conversation with Husman, plaintiff spoke of the doctor's certificate authorizing him to resume work on May 18th. Plaintiff further testified that he asked Husman "if I had had any permanent injury or disability at that time." Husman replied, " 'On the basis of what I have before me, there is no permanent injury or disability.' " Whereupon plaintiff said to Husman that he was willing to take the latter's word for it, but Husman said, " 'You don't have to take my word for it. Here's the record,' " and handed plaintiff the Surgeon's Injury Report mentioned supra. Plaintiff then told Husman, that inasmuch as there was no permanent injury or disability, "I would settle the claim." When testifying, plaintiff was confronted with a statement, "Defendant's Exhibit B," in which he said, " 'I understand that my knee was bruised and that I had an injury

to the cartilage of my knee.'" Plaintiff explained that if a mention had been made concerning the cartilage, it was an error "because I never knew what a cartilage was until the operation was performed"; but plaintiff said he may have mentioned the cartilage, "I don't know. I heard of a cartilage in some conversation. The doctors didn't tell me that. It could have been a patient in the room." Klein testified that, when the settlement was referred to him by Husman, he concluded from an examination of the file pertaining to plaintiff's case that defendant was not legally liable, and he limited Husman to a payment of $450 in settlement. He had seen that plaintiff had alluded to an injured cartilage in his statement, "Defendant's Exhibit B." Klein did not consider cartilage trouble. at the knee a "mere trifling incident." He thought plaintiff knew what a cartilage injury was.

■ Section 5 of the Federal Employers' Liability Act, 45 U.S.C.A. § 55 providing that any contract "the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void" does not mean that the carrier may not compromise or settle claims and obtain releases based upon settlements. And one who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted. Callen v. Pennsylvania R. Co., 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242. The question of the validity of a release given a carrier by an injured employee is a federal question to be determined by federal rather than state law. Dice v. Akron, C. & Y. R. Co., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398; Chicago & N. W. Ry. Co. v. Curl, 8 Cir., 178 F.2d 497; Graham v. Atchison, T. & S. F. Ry. Co., 9 Cir., 176 F.2d 819; Thompson v. Camp, 6 Cir., 163 F.2d 396. State cases, cited by defendant-appellant, such as Vondera v. Chapman, 352 Mo. 1034, 180 S.W.2d 704, in which the Federal Employers' Liability Act was not involved, are of little service to us here.

And it seems the language of a release indicating a compromise and providing for a settlement of injuries "including those which may hereafter develop" does not validate a release if basically invalid because of fraud or mutual mistake. Callen v. Pennsylvania R. Co., supra; Chicago & N. W. Ry. Co. v. Curl, supra; Thompson v. Camp, supra.

Husman and Klein were plaintiff's witnesses, and defendant-appellant contends plaintiff was bound by their testimony. This contention is especially directed to their testimony that they had seen plaintiff's written statement mentioning the possible injury to the cartilage of the right knee, and that they did not consider such an injury trivial. It is argued that, inasmuch as they knew of plaintiff's statement relating to the cartilage injury and considered such an injury a serious one, there could be no mutual mistake of fact which could be the basis for the avoidance or rescission of the release.

Notwithstanding the testimony of Husman and Klein, there was other evidence supporting the reasonable inference that, when the release was executed, plaintiff and Husman and Klein thought plaintiff's injuries were trivial and temporary, even though they may have been cognizant that plaintiff might have sustained a cartilage injury. We have noted that no mention was made of an injured or torn cartilage in any hospital record; that the Surgeon's Injury Report, at hand when the settlement was made, expressly noted there was no permanent defect and no permanent disability; and that plaintiff was permitted to go back to work. Moreover, the release itself, in the "typed-in" recitation of plaintiff's injury, followed the language of the Surgeon's Injury Report, as follows, "contusion and superficial abrasion of shin in the upper third of the right lower leg, some tenderness over medial aspect of right knee, and contusion right middle finger." The release was prepared at defendant's claim office and under Husman's supervision.

The complete absence of any reference to a cartilage injury in the hospital records and the Surgeon's Injury Report, and es-

pecially in the release, was not only an indication that physicians treating plaintiff did not know of a cartilage injury (or that, if they knew, they considered such injury inconsequential), but was justification for a reasonable inference that plaintiff and Husman and Klein, at the time the release was executed, were relying on the notations contained in the hospital records and in the report, and believed plaintiff had sustained no serious or permanent injury. It is true plaintiff's knee had "locked" five or six times within a few days after he was injured; and it is also true that, as stated, the hospital record of May 12th recited, "Knee no longer locks."

■ We are of the opinion the evidence, considered from a standpoint most favorable to plaintiff, justified the finding of a mutual mistake as a present material fact— the nature and extent of plaintiff's injury. The inference is reasonable that both plaintiff and defendant believed plaintiff's injuries were "temporary and of a minor nature," and it is not contended the evidence does not justify the finding the injuries were "substantial and serious and of a permanent nature," as submitted in plaintiff's Instruction No. 1.

■ On voir dire the veniremen were asked by defendant's counsel if they felt that "regardless of the circumstances surrounding the injury, that every man who is hurt while performing a duty to his employer should be paid something? Is that the way you feel about it? Not what the law is, but how you feel about it." Sixteen of the veniremen answered that an injured plaintiff should be compensated "at least to some extent, regardless of the circumstances." Defendant's counsel challenged the sixteen veniremen, whereupon the trial judge advised and inquired of the panel as follows, "I will have a couple questions to propound to you, and then I will ask you individually how you feel about them. The first one is, will you and each of you be able to follow the Court's instructions, which will be the law applicable to this case, and use those instructions, as the law applicable to the evidence which you will hear in this case?" The eighteen veniremen all and individually answered these questions in the affirmative. The trial judge further advised and questioned the jury as follows, "Now, do you all understand that under the law applicable to these cases that the plaintiff has the burden of proving his case by a preponderance of the evidence? Do you understand that? All of you individually? And that absent that proof, the plaintiff would not be entitled to recover? * * * And the Court will give you an instruction to that effect, and will you all follow it, without my asking you individually again, will you all follow that instruction? * * * Now, this case is different than a compensation case. This is a Federal Employers' Liability case, and the plaintiff has the burden of proving his case, and proving the defendant negligent. That is not necessary in a compensation case. Do you understand that, all of you? And you will follow that law? If the defendant was not negligent, the plaintiff would not be entitled to recover. * * * You would follow that too? All right." It is inferred that the entire panel of veniremen indicated an affirmative answer.

■ It is noted that defendant's counsel in making his voir dire inquiry asked the veniremen as to how they felt personally, regardless of the circumstances, and, in effect, expressly withdrew their consideration of "what the law is." And upon the trial judge's quoted advice and questions, all of the veniremen answered that they would follow the trial court's instructions on the law of the case. Even if it were assumed that the question by defendant's counsel on voir dire was proper, we believe it should not be held in this situation that the trial court abused its discretion in refusing defendant's challenges for cause. This court treated with a similar situation in the case of Timmerman v. Terminal R. Ass'n of St. Louis, 362 Mo. 280, 241 S.W.2d 477, wherein it was held that this court could find no error in the trial court's ruling on the challenge for cause. The ruling in the Timmerman case was approved in a substantially like situation in Peterson v. Kansas City Public Service Co., Mo.Sup., 259 S.W.2d 789. In the later case of Moore

v. Middlewest Freightways, Inc., Mo.Sup., 266 S.W.2d 578, 584, cited by defendant-appellant, it was correctly said that a trial judge should be and is vested with broad discretion in determining the qualifications of veniremen to sit as jurors, and his rulings should not be disturbed unless they clearly and manifestly are in abuse of such discretion. And it was said it is also fundamental that the venireman is not the judge of his own qualifications. In that case, however, the questioned venireman admitted prejudice against "the big fellow", and the venireman was promptly advised by plaintiff's counsel that defendant in that case was "a pretty big carrier", and the challenged venireman never did unequivocally indicate his feeling against "the big fellow" would not sway him in a particular case.

We have referred to plaintiff's signed statement, "Defendant's Exhibit B," which included a reference to a possible injury to the cartilage of his knee. In the course of the trial, defendant's counsel said he would like to read a portion of the statement, whereupon plaintiff's counsel said he thought defendant's counsel "should read the entire statement." Defendant's counsel said he thought plaintiff's counsel "should be reprimanded for making such a request or suggestion under the circumstances, and where and when and how made." The trial judge remarked that defendant's counsel could read those portions that he wanted to read, and that plaintiff's counsel then could read any portion that he wanted to read. Defendant's counsel said, "That will depend, I assume, on whether or not the other portions are competent." To which the trial court replied, "That is true of any instrument." Defendant's counsel then said, "Yes, sir. And the portion that I want to read is * * * 'I understand that my knee was bruised and I had an injury to the cartilage of my knee.'"

Defendant-appellant says the suggestion by plaintiff's counsel that the entire statement should be read was prejudicial for the reason that it left the impression with the jury that defendant's counsel was not being frank and fair by purposing to read only a portion of the statement, although plaintiff's counsel well knew that he would not be entitled to read, and that defendant's counsel was not required to read the portions of plaintiff's statement which were self-serving. This trial incident was not entirely unlike that which occurred in the trial of the case of Walsh v. Terminal R. Ass'n of St. Louis, 353 Mo. 458, 182 S.W.2d 607, 611, of which this court said it thought plaintiff's suggestion, that the whole of a statement be read, was to secure an undue advantage of defendant—"to put defendant 'in the nine hole with the jury,' as stated by counsel." In the Walsh case no objection or request was made by defendant, and here we have a request for a reprimand. The trial court did not rule on the request, but outlined a course counsel could pursue; and after the ensuing colloquy the request for a reprimand was lost sight of and no further request for any action was made. While the suggestion by plaintiff's counsel was improper, Walsh v. Terminal R. Ass'n of St. Louis, supra, it is apparent that defendant's counsel was satisfied at the time with the result of the ensuing colloquy. In any event defendant's counsel did not in any way indicate he was dissatisfied by renewing his request for a reprimand or by making any other request for any other action on the part of the trial court; and the trial court, it seems, did not consider that defendant's counsel was further complaining of the incident. We agree with the view which defendant's counsel apparently had at the time that, although the suggestion by plaintiff's counsel was improper, yet in its finality the incident as a whole was not prejudicial.

The following occurred during plaintiff's argument to the jury,

"Now, * * * he (plaintiff) said someone else told him it might have been a serious injury. Are you going to lie about whether or not somebody, maybe a bed-mate in your room, told you in your hospital room, 'Well, there may be something wrong with your leg, your knee, with the cartilage'? Maybe he was told that. I don't think he was. Maybe he was, but did he believe it? Did he rely on it?

"Mr. Sheppard (defendant's counsel) : Let me object to that. He can't repudiate his own client, surely, and argue to the jury. That's what his client said.

"The Court: The jury heard the evidence as to what transpired, and they will be guided by that and not by the argument of counsel.

"Mr. Sheppard: May I ask for a rebuke of counsel?

"The Court: It will be denied."

And again plaintiff's counsel in argument referred to the preparation of the release and said, "Who prepared this release? It was prepared under Mr. Husman's direction, and do you remember, I asked Mr. Husman, 'Do you customarily put all the injuries, all the injuries, all the injuries in these releases?' And what did he say? After wiggling around a little bit, he said, 'Yes.' " Defendant's counsel objected on the ground that Husman was plaintiff's witness; and that plaintiff had no right to attack the the credibility of the witness, "because he is bound by his evidence, which is uncontradicted by anybody."

 Attending the latter incident—we do not understand the argument was an attack on the credibility of the witness Husman. It is obvious the argument was that Husman had testified truthfully but reluctantly. Although Husman was called to the witness stand by plaintiff, he was also defendant's claims investigator. If the witness did wiggle "around a little bit" in making a truthful answer, it was a circumstance which could be legitimately mentioned in argument. Neither was the first incident above related a repudiation of the testimony of plaintiff. Plaintiff's testimony was that he may have heard someone mention a cartilage injury. The argument was designed to negative plaintiff's reliance upon this information at the time he executed the release.

Was the amount of the award excessive?

 The verdict, $11,885, may be considered as augmented by the $450 plaintiff received when the release was executed, the return of which amount having been tendered defendant and refused and the amount retained by plaintiff. So the award was really $12,335. We have stated medical evidence. Plaintiff's loss of earnings was approximately $1,681. No expense for treatment, surgery or hospitalization was shown in evidence. It is inferred that after August 3, 1953, plaintiff had continued in his employment as a switchman. During August and September, 1953, his knee was very painful when he was working, and during following months of cold weather the knee would stiffen and the pain would become greater. "The present condition (at the time of trial in January, 1955) seems good, but at times after a hard day's work, or I bump my toe or bump my knee on an engine, the pain returns and it is very severe."

Defendant-appellant has cited McGarvey v. City of St. Louis, 358 Mo. 940, 218 S.W.2d 542, decided in 1949, in which case a sewing machine operator, thirty-six years old, had an injury to the left knee resulting in chronic synovitis, a permanent condition unless relieved by surgery. Relief by surgery was doubtful, but the fact remains that no crucial cartilage was removed. A muscle of the leg was moderately atrophied. This could have been caused by an injury to a nerve supplying the muscle. There was crepitation in bending and in straightening the knee, and tenderness and spasm of the muscles in the lower back. Plaintiff's injuries slowed her up to some extent, but her ability to turn out work was not greatly impaired. A $10,000 award was reduced to $7,500. We have also examined Mrazek v. Terminal R. Ass'n of St. Louis, 341 Mo. 1054, 111 S.W.2d 26, decided in 1937, in which a $15,000 judgment was reduced to $10,000. Plaintiff Mrazek, a freight clerk sixty years old, sustained injuries—a multiple fracture of the tibia, torn muscles of the leg, and ensuing inflammation of a nerve—leaving plaintiff, at the time of trial, with a painful leg which became swollen when used and with permanent impairment of forty per cent in the use of the leg. In neither of these cited cases was there a statement of loss of earning, and economic conditions.

at the time the Mrazek case was decided definitely were different from now.

In the instant case we have noted that plaintiff lost wages in the amount of $1,681. He underwent painful surgery in which an important stabilizing cartilage of the knee was excised. He suffered a major and permanently painful and partially disabling injury affecting the stabilization of the knee with residual inflammation of a nerve. Having carefully considered the evidence bearing upon the nature and extent of the injury with a regard for the factors to be taken into account in determining a question of the excessiveness of an award, we believe we are not justified in holding the award grossly excessive.

The judgment should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.