STATE of Missouri, Respondent,

v.

Weldon ALLEN, Jr., Appellant.

No. 56833.

Supreme Court of Missouri,
Division No. 2.

Oct. 9, 1972.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Gordian S. Benes, St. Louis, for appellant.

HENRY I. EAGER, Special Commissioner.

Defendant was convicted by a jury of second degree murder. The jury was unable to agree on the punishment and the Court sentenced him to a term of 20 years. Motion for a new trial was overruled and defendant has appealed as a poor person but is represented here by his original retained counsel. The appeal was filed here prior to January 1, 1972, hence we have jurisdiction. Two points are made in the brief: (1) that the Court erred in not granting a mistrial because of disclosures which indicated that a juror could not be impartial; and (2) that the verdict was not supported by substantial evidence. We suppose that the latter is intended to mean that the evidence was not sufficient to sustain a finding of guilt beyond a reasonable doubt.

The State's evidence justified the following recital. On the evening of October 20, 1970, Frank Thorpe and Mildred Thorpe, his wife, drove to the main post office in St. Louis in their Rambler car at about 7:30 or 8:00 p. m. They mailed his "unemployment card" and started home north along Jefferson Avenue. At a stoplight, at or near Cole and Jefferson, they heard a car behind them sound its horn; they pulled to the curb and Frank Thorpe got out; the other car was right behind them; two men got out of it. Thorpe and the man who was later identified as the defendant went to the sidewalk where they stood alongside the Thorpe car, defendant being very near Mrs. Thorpe; they held a short, and apparently rather meaningless conversation. The other man in the rear car, identified as Gary Miles (or Meyers) took no part in the proceedings. Defendant and Thorpe were standing about three feet apart, on the passenger's side of Thorpe's car. The lighting at the scene was good, and Mrs. Thorpe's window was "rolled down." Suddenly the defendant "pulled a pistol and fired and my husband fell * * *." Mrs. Thorpe counted three shots, but the autopsy showed five. Defendant then ran through the Pruitt-Igoe "housing project" and disappeared. Mrs. Thorpe and Miles tried to lift Thorpe into his car, but could not; she finally found a police car and he was taken to a hospital where he was soon pronounced dead. The autopsy showed the cause of death as multiple gunshot wounds, with lacerations of the liver, the spleen and the aorta. Mrs. Thorpe was taken from the hospital to the police station where she told the police what she knew and had seen, including the fact that she had known the man who shot her husband when he was a boy in the neighborhood where she then lived, and that his first name was "Weldon." She had not known his last name—nor his mother's. Upon being shown certain photographs she identified one as this defendant and the man who shot her husband. She had looked at the man closely at the time of the shooting. The next day in a lineup of four men she identified defendant as the man who shot her husband and also identified a certain leather jacket as

the one he was wearing when Thorpe was killed. At the trial she positively identified the defendant as the man who killed her husband. The jacket which Mrs. Thorpe identified had been taken off by the defendant before the lineup at Detective Riley's suggestion. The pistol used was not recovered. Mrs. Thorpe was 31 years old at trial time.

At midafternoon on the next day, October 21, defendant came to police headquarters, having been informed that the police wanted him. He was advised of his constitutional rights by Detective Riley, and was placed in a lineup with three other men, where Mrs. Thorpe viewed him. As stated, she identified him very definitely and so testified at the trial. Defendant was interrogated, but no admissions are claimed. He knew Thorpe by sight. The police also talked to Miles but evidently he was not held or charged. He was then on parole. The evidence does not fairly show any reason or motive for the killing.

The defense was alibi. Defendant testified that he had been in or about a tavern substantially all afternoon on October 20 until about 5:30 or 6:00 p. m. when he took Albert Moore, Jr. to his home at 3769 Lee. Moore was a paraplegic and lived there with his wife, his sister Glenda, and Glenda's child. Glenda was admittedly defendant's "girl friend" and he testified that he spent much time there, including three or four nights a week. Defendant testified that he was in this home with these people from about 6:00 p. m. on October 20 until around noon or later the next day. It is wholly unnecessary to relate the details of that testimony, such as the watching of TV, drinking beer, eating, etc. The net result was that defendant denied shooting Thorpe and fixed his presence in the home of Albert Moore as of that time and long after. Albert Moore and his wife, Betty Jean, verified his presence there, Albert in laborious detail. When these people learned of the charge against defendant they did not at any time go to the police to advise them of defendant's presence in their home.

■ We shall relate now the occurrences at the trial which give rise to defendant's first point, namely, the failure to declare a mistrial. At the end of the first day of trial a juror, Kathryn J. Barfield, came to Judge Casey, and told him: that since it had been brought out that defendant "lived on Greenlea," about five blocks from her home, she was "a little bit scared"; that she had never served on a jury before, and that she had children; that she was not afraid for herself, but she asked could there later "be a chance of anything happening?" The Judge told her that he did not believe there was any cause for alarm, anymore than that she "might be struck by an automobile"; there was a little more conversation and she appeared to be reassured; upon express inquiry by Judge Casey she said that "it would not influence my judgment, at all." The Judge repeated that in his experience there was no cause for alarm, told her to feel free to get in touch with him, and that she would be protected. After this juror left, the Court had the reporter read to counsel the recording of the entire transaction from his notes. At the convening of Court the next morning the Court again called the attorneys to his chambers. It is shown that the attorneys had agreed to the procedure which the Court followed in interviewing the juror. The State required no further reading of the notes, nor did the State's counsel wish to interrogate the juror further. Counsel for defendant wished no further reading of the notes, but moved for a mistrial on the ground that the juror could not "dismiss these feelings" from her mind and that her decision would be prejudicial to the defendant; however, he expressly declined, then and again later, to examine the juror further, though offered the opportunity to do so. The matter was discussed at some length by Court and counsel and the motion was overruled. The motion for a mistrial was renewed and overruled at the close of all the evidence.

We consider first the ruling of the Court on that motion. Counsel argues that Mrs. Barfield's "concern for the safety of her children" prevented her "from being able to fairly and impartially hear the evidence, thereby depriving defendant of his right to a fair and impartial trial." We may say, first, that if any such fear affected her at all, there is no more reason to suppose that it would be prejudicial to the defendant than it would to the State. Counsel cites only the case of Coppedge v. United States, 106 U.S.App.D.C. 275, 272 F.2d 504. There, the named defendant and four others had been indicted on multiple counts for breaking and stealing. Three of the others plead guilty and one was acquitted. One co-defendant, Thompkins, was called as a witness by the government, whereupon, despite the orders of the Court, he absolutely refused in the presence of the jury to take the stand or be sworn; his lawyer was called in and could accomplish nothing. At a recess it was explained to the Court that the defendant had viciously beaten the prospective witness' brother in his presence, and that he, the witness, was in mortal fear of the defendant. The jury had been permitted to separate. On the following day articles appeared in two newspapers giving accounts of the proceedings, including statements of the beating and "pistol whipping" of the brother by the defendant, and the statement of the prosecutor that the defendant was a vicious criminal; one article stated that defendant was serving a term for the beating; and one stated that the trial judge said that the authorities could not guarantee protection. The witness was found guilty of criminal contempt but sentence was suspended. When the trial resumed defense counsel moved for a mistrial, producing the newspapers; the Court, noting in advance that it would overrule the motion, asked the jurors collectively if any had read the articles and stated that such articles must not affect their decision; four regular jurors and one alternate had read one or both articles. The Court then asked the jury as a whole if there was any one who could not ignore the news articles and render a verdict on the evidence. There was no response, and the motion was overruled. The Court had not previously admonished the jury about keeping away from newspapers, television and radio. On appeal the conviction was reversed because of these occurrences. The Court held: that the inquiry of the jury here was not sufficient; that each juryman should have been asked, separately and apart from the others, about his reactions; that a juror might hesitate to admit prejudice in the presence of the others; that the articles were clearly prejudicial to defendant; that the jury had seen the witness' actions, and learned of his mortal terror of defendant and that the latter was a vicious criminal; and that these things could not be erased from their minds.

That case is in no way comparable to ours. Here a juror merely stated that she was a "little bit scared," partly because she had never before served on a jury. She was reassured by the Court and, upon express and individual inquiry, stated that the circumstances would not influence her judgment at all. She did not ask to be released as a juror. We have here none of the violently prejudicial elements of the Coppedge case, and it stands in no way as an authority. We note further that defendant's counsel here twice refused to interrogate Mrs. Barfield, though offered full opportunity to do so. In Coppedge the "fear" was on the part of a witness, not a juror, and the exhibition of that fear, plus the inadmissible and prejudicial news articles, was such as to convince the jury that the defendant was a most vicious and convicted criminal. We are unable to see that the case is of any materiality here. The mere fact that some "fear" may have been expressed by someone for some cause does not make the case persuasive here.

■ The competency of a juror is particularly a matter for the determination of the trial court, and its discretion in acting thereon should not be reversed unless the discretion has clearly been abused. State

v. Camper, Mo., 353 S.W.2d 676; State v. Harris, Mo., 425 S.W.2d 148; Cleghorn v. Terminal R. Ass'n of St. Louis, Mo., 289 S.W.2d 13; Eickmann v. St. Louis Public Service Co., Mo., 323 S.W.2d 802; State ex rel. State Highway Commission v. McMurtrey, Mo., 300 S.W.2d 521. In most of those cases the question arose on voir dire, but the substantive principle is fully applicable here.

In Marshall v. United States (CA 9), 355 F.2d 999, there was a claim of prejudice to defendant from newspaper articles connecting defendant with a prior bombing and with the "syndicate." Certain jurors had read one article or heard a television report. On private individual interrogation by the Court each juror said that he had not been influenced or prejudiced. The Court instructed the jury to avoid all reading and listening to such things. The motion for mistrial was overruled. On appeal the Court held that a large discretion was vested in the trial court in such matters, that the trial court believed the jury could be trusted and that it would not substitute its opinion for that of the trial court. That case, also, is not strictly applicable on our facts, but it indicates that Coppedge (which was discussed) rested upon an individual and peculiar state of facts, and it affirms the rule of discretion which Missouri has always followed. The case of Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, cited in the Coppedge case, also involved the reading by jurymen of highly prejudicial news articles concerning the defendant. The facts are so different from ours that a discussion is not justified. All authorities hold that each such case must be decided on its own individual facts. We hold that there was no error in denying the motion for a mistrial in the present case. The trial court was most cautious in resolving the question and its discretion was certainly not abused.

The remaining point,—the sufficiency of the evidence,—may be readily disposed of. Defendant made an oral motion for acquittal, stating nothing specific, at the close of the State's case and again at the close of all the evidence. Counsel simply say now that the jury did not have "enough evidence of defendant's participation" to convict him. It had the positive identification of Mrs. Thorpe, both at the lineup and at the trial; she had an excellent opportunity to see and observe defendant at close range, over a period of at least several minutes. There was also, if needed, the identification of his jacket, which we believe was not essential. The fact that there were, supposedly, sundry jackets like this one, merely went to the weight of the evidence; and the identified jacket was one which the defendant had just removed. There was the added fact that Mrs. Thorpe recognized the defendant as a person whom she had known years before as a boy, and well enough that she remembered his first name. Counsel cites only State v. Wright, 319 Mo. 46, 4 S.W.2d 456. There, in a robbery case, the State's evidence consisted largely of defendant's confession and the testimony of one victim who supposedly was a gambler and bootlegger. Defendant claimed error for failure to instruct that the jury must find defendant guilty, if guilty at all, from evidence independent of the confession. The Court denied this contention and merely held that all the evidence should be considered, including the confession. The judgment was affirmed. We failed to see that the case has any applicability whatever here.

The positive identification of defendant by Mrs. Thorpe was amply sufficient to sustain the conviction of defendant. The identification by one witness has frequently been held sufficient. State v. Smith, Mo., 298 S.W.2d 354; State v. Stockdale, Mo., 415 S.W.2d 769; State v. Williams, Mo., 376 S.W.2d 133; State v. Reece, Mo., 324 S.W.2d 656; State v. Tucker, Mo., 451 S.W.2d 91; State v. Dowe, Mo., 432 S.W.2d 272. In Williams, supra, the Court said, 376 S.W.2d l.c. 136: "The testimony of a single witness, if believed by the jury beyond a reasonable doubt, is sufficient to

establish the identity of the defendant in a criminal prosecution since the credibility of the witness and the weight of the evidence is for the jury." (Citing cases.) Here the jury obviously believed the testimony of Mrs. Thorpe and disbelieved all the alibi evidence. The State's evidence was ample for submission, and we do not review its weight. The point is denied.

We find no reversible error and the judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.